SIXTH DIVISION

March 12, 1999

No. 1-97-4003

NORTHWEST MOSQUITO ABATEMENT DISTRICT, ) 

) 

Petitioner-Appellant, )

)

v. )

)

ILLINOIS STATE LABOR RELATIONS BOARD; )

MANNY HOFFMAN, Chairman; )

ROBERT M. HEALEY, Member; )

JACALYN J. ZIMMERMAN, General Counsel; )

JOHN BROSNAN, Administrative Law Judge; )

SHARON WELLS, Administrative Law Judge; )

MARY WRIGHT, Board Representative; and )

INTERNATIONAL BROTHERHOOD of TEAMSTERS, ) 

LOCAL 714, )

Respondents-Appellees. )

JUSTICE BUCKLEY delivered the opinion of the court: 

Northwest Mosquito Abatement District (District) appeals an Illinois State Labor Relations Board (Board) decision that issued a certificate of representation naming Teamsters Local 714 (Union) as the exclusive bargaining unit for District employees.  The District filed this timely petition for direct review and maintains: (1) the Board incorrectly found that the District employed the jurisdictional minimum of 35 employees, as required by section 3(n) of the Illinois Public Labor Relations Act (Act)(5 ILCS 315/1 et seq (West 1993)); (2) the Board erred in concluding that the District's field supervisors were not supervisors under section 3(r) of the 

Act; and (3) the Board erred by refusing to consider evidence offered by the District after the petition was filed.  For the following reasons, we affirm the decision of the Board.

The relevant facts are as follows:  The District is a local government unit organized under the Mosquito Abatement District Act 70 ILCS 1005/1 et seq. (West 1994) that provides mosquito control services for northwest Cook County.  It is the duty of the District to find and kill mosquito larvae, and spray the adult mosquito population.  The District is a public employer within the meaning of the Act.  See 5 ILCS 315/3(o)(West 1996).

The District is governed by a five-member board of trustees.  At all times relevant to this case, the director was Glenn Levinson (Levinson), and the assistant director was Mike Szyska (Szyska).  The four department heads were: chief of internal services Dave Baker, chief of drainage Mark Baker, entomologist Donald Oemick, and chief of field operations Szyska.  The District also employed an office manager, an assistant chief of internal service, three mechanics, an auto service worker and three field supervisors.
(footnote: 1)  Working with the field supervisors were the roughly 54 seasonal field employees who inspect and treat water sources and take part in mosquito abatement programs during the summer months (mid-May to mid-August).  

Ninety percent of the seasonal workers are college students or individuals of college age.  Every December, the District's assis-

tant director asks the field supervisors to provide him with a list of seasonal employees who worked for the District the prior season and should be rehired.  The director then sends job applications to those individuals in December.

In March or April, the District places advertisements in local newspapers seeking additional seasonal workers for the coming season.  To qualify for seasonal employment with the District, an applicant must have a valid driver's license and no driving-under- the-influence convictions, no more than one speeding ticket in the last two years, no more than three minor moving violations in the past three years, and not more than one moving violation in the past six months.  The seasonal employees are also required to obtain a pesticide operator's license from the Illinois Department of Agriculture.  New hires are entitled to a grace period that allows them to obtain the license while working for the District.  The license is valid for three years, but rehires may renew their licenses if sponsored by a field supervisor.  Both rehires and new hires must apply for employment with the District but, unlike new hires, rehires do not have to interview.

Prior to the summer of 1996, the District sent applications to 46 of the 54 seasonal workers who had worked the previous year.  The District then hired 63 seasonal employees for the 1996 mosquito season, 28 of whom were rehires with between one and six years of experience.

During the nine-month off season, the field supervisors survey and check mosquito sources, compile lists and records of potential mosquito sources, redraft maps to reflect mosquito sources, attend policy meetings and engage in continuing education concerning mosquito abatement and public health.  Then, during the summer months, the field supervisors train seasonal employees, monitor work and assign equipment.  They also maintain seasonal employees' work records and evaluate their performance.  The field supervisors have the authority to reward seasonal employees, approve overtime and initiate disciplinary measures. 

On January 28, 1997, the Union filed a petition for representation seeking to form a bargaining unit consisting of the District's assistant to the chief of internal services, the field supervisors, the mechanics and the auto services worker.  The seasonal employees were not part of the proposed bargaining unit.   At a hearing on the petition on February 27, 1997, the District and the Union stipulated to the following: (1) of the 13 District employees, five were either managers, supervisors or confidential employees under the Act and were not "public employees"; (2) five others were public employees under the Act; and (3) the Union is a labor organization under the Act.  Assistant director Szyska testi-fied for the District at the hearing.  He stated that each summer the District hires about the same number of seasonal employees, approximately 54.  For the summer of 1996, the District hired 63 seasonal employees, 28 of whom were rehired from the prior summer.  Szyska further stated that even though it is not standard procedure, if a new employee's performance is satisfactory, he/she may be told he/she will be rehired the next summer.  In December of 1996, Szyska sent 46 applications to seasonal employees from the previous summer and offered them employment for the upcoming summer.  The number of applications sent out to former employees may vary by as much as 10, but the number of people reapplying for seasonal employment also varies.

Field supervisor John Blankenberg testified for the Union.  According to Blankenberg, many seasonal employees worked for the District for two or more summers.  He stated that the employment records showed approximately half of all seasonal employees were rehired from a previous summer.  Mechanic Frank Hernandes also testified for the Union.  He stated that 20 seasonal employees worked at his shop in Hoffman Estates and of those 20 employees, 15 had been rehired from the summer of 1995.

On June 13, 1997, the administrative law judge (ALJ) issued a recommended decision and order finding that the seasonal employees were public employees according to the meaning provided in the Act.  The ALJ concluded that the District had more than 35 employees and, therefore, the Board had jurisdiction over the District.  In addit-ion, the ALJ found that the field supervisors were not supervisors within the meaning provided in the Act.

On June 23, 1997, the District filed a motion to supplement the administrative record and to reconsider.  The District sought to supplement the record with an affidavit of acting director Szyska stating that the District had received 20 employment applications from prior seasonal employees but only rehired eight.  Then, on June 27, 1997, the District filed its exceptions to the ALJ's recommended decision and order.

On August 26, 1997, the Board issued a final decision and order affirming the ALJ's recommendations.  The Board found that the seasonal workers were not "short-term" employees within the meaning of the Act because the majority of the seasonal employees had a reasonable assurance of rehire by the District in subsequent years, they were not required to interview for the job and many former employees had already obtained a pesticide operator's license.  The Board also found that the field supervisors were not supervisors under the Act since they did not spend the preponderance of their employment time engaged in supervisory duties.  Furthermore, the Board determined there was no conflict of interest in including the field supervisors in a bargaining unit because the seasonal employees were not members of the unit.

As a final matter, the Board also denied the motion to supplement the record with Szyska's affidavit because the affidavit sought to introduce evidence of facts occurring after the petition for representation was filed.  The Board ruled that the significant date for determining whether an employer is covered by the Act is the date the petition for representation is filed.

On September 23, 1997, the Union was elected exclusive bargaining representative of a bargaining unit consisting of the assistant to the chief of internal services, the mechanics, the auto services worker and the field supervisors.  On October 7, 1997, the Board issued a certificate of representation certifying the Union as the exclusive representative of the bargaining unit.

I  STANDARD OF REVIEW

On appeal, the District challenges the Board's decision to certify the Union as the exclusive representative of a bargaining unit.  Judicial review of the Board's decision is governed by the Administrative Review Law (735 ILCS 5/3-101 (West 1996) (40 ILCS 5/18-164 (West 1996)), and extends to all questions of law and fact presented by the record.  5 ILCS 315/9(i)(West 1996); 
County of Cook v. Licensed Practical Nurses Ass'n, 
284 Ill. App. 3d 145, 152 (1996).  In reviewing the Board's decision to certify the Union as the exclusive representative of the bargaining unit, this court should not reweigh the evidence but, instead, should determine whether the Board's decision was contrary to the manifest weight of the evidence.  
City of Freeport v. Illinois State Labor Relations Board, 
135 Ill. 2d 499, 507 (1990); 
Licensed Practical Nurses Ass'n, 
284 Ill. App. 3d at 152.

Under the manifest weight of the evidence standard, the Board's findings of fact are prima facie true and correct.  735 ILCS 5/3-110 (West 1996); 
Chief Judge of the Circuit Court v. American Federation of State, County & Municipal Employees, Council 31, 
153 Ill. 2d 508, 514 (1992).  A decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the agency, the court determines that no rational trier of fact could have agreed with the agency's decision.  
Chief Judge of the Circuit Court, 
153 Ill. 2d at 514.  Thus, the Board's decision should not be reversed unless "it is clearly evident that [it] should have reached the opposite conclusion."  
City of Freeport, 
135 Ill. 2d at 507.

The Board's conclusions of law, on the other hand, are not entitled to the same deference and are reviewed de novo.  
Licensed Practical Nurses Ass'n, 
284 Ill. App. 3d at 152.  Yet, an agency's interpretation of a law it is charged with administering or enforcing is entitled to substantial weight and deference.  
Licensed Practical Nurses Ass'n, 
284 Ill. App. 3d at 152.  This deference is accorded an agency's interpretation of its enabling statute because "agencies can make informed judgments *** based on their experience and expertise."  
Illinois Consolidated Telephone Co. v. Illinois Commerce Comm'n, 
95 Ill. 2d 142, 153 (1983).  When mixed questions of law and fact are involved, requiring an examination of the legal effect of a given set of facts, the Board's resolution of such questions is to be upheld if reasonable, consistent with labor law and based on findings supported by substantial evidence.  
City of Belvidere v. Illinois State Labor Relations Board, 
181 Ill. 2d 191, 205 (1998)(applying clearly erroneous standard of review in deference to Board's analysis of a mixed question of fact and law); 
Rockford Township Highway Department v. Illinois State Labor Rela-tions Board, 
153 Ill. App. 3d 863, 875 (1987).

II SEASONAL EMPLOYEES

It is well settled that the Act does not apply "to units of local government employing less than 35 employees."  5 ILCS 315/20(b)(West 1996).  The Act defines a "[p]ublic employee" or "employee" as "any individual employed by a public employer."  5 ILCS 315/3(n)(West 1996).  However, many different types of public employees are excluded from the Act because of their unique status.  For example, managerial employees, confidential employees, supervisors and short-term employees are all excluded.  5 ILCS 315/3(n)(West 1996).

1. Short-Term Employee Test

The District maintains that its seasonal employees are short-

term employees as defined in section 3(q) of the Act and, therefore, do not qualify as public employees under section 3(n).  We disagree.   The Act defines a short-term employee as:

"an employee who is employed for less than 2 consecutive calendar quarters during a calen-dar year and who does not have a reasonable assurance that he or she will be rehired by the same employer for the same service in a subse-quent calendar year."  5 ILCS 315/3(q)(West 1996).

This definition is conjunctive, so both elements must be met in order to find that an individual is not a public employee under the Act.  
Laborer's International Union of North America, Local 1280 v. Illinois State Labor Relations Board, 
154 Ill. App. 3d 1045, 1062 (1987).  

The Board concedes that since the District's seasonal employees only work from mid-May to mid-August, they work less than two consecutive quarters and, therefore, meet the first prong of the short-term employee test under the Act.  See 
William Rainey Harper Community College 512 v. Harper College Adjunct Faculty Ass'n, 
273 Ill. App. 3d 648, 652 (1995)(only those employees who work less than six consecutive months during a calendar year can be short-term employees).  But even if the seasonal employees are not employed for two-consecutive calendar quarters, they may still be "public employees," rather than "short-term employees," if they fail to meet the second prong of the test.  Thus, our analysis should focus on whether the District's seasonal employees had a reasonable assurance they would be rehired for the same job in a subsequent calendar year.

The District asserts that, on the basis of facts presented to the ALJ, it was unreasonable for the Board to conclude that a reasonable assurance existed that the District would rehire its seasonal employees.

The Board has repeatedly defined "reasonable assurance" as "when an employee leaves [employment], he or she has a strong belief that [he/she] will be able to work there again in subsequent years ***. Reasonable assurance is not quite a guarantee, but almost."  
Granite City Park District Steelworkers, 
12 Pub. Employee Rep. (Ill.) par. 2028, No. S-RC-96-004, at X-14 (ISLRB May 30, 1996); 
City of Rushville, 
8 Pub. Employee Rep. (Ill.) par. 2042, No. S-RC-92-66 (ISLRB August 25, 1992).  To determine if an employee has a reasonable assurance of rehire, the Board examines the following factors: (1) whether any preference is given to those who have worked for the governing body in previous years; (2) whether the position requires a special license or certificate; (3) whether the individuals must reapply each year; (4) the number of individuals rehired from year to year; and (5) whether the employer has made any assurance or indicated that it will rehire the individual.  
Granite United Park District Steelworkers, 
12 Pub. Employee Rep. (Ill.) par. 2028, No. S-RC-96-004 (ISLB May 30, 1996); 
Village of Manteno, 
10 Pub. Employee Rep. (Ill.) par. 2046, No. S-RC-94-69 (ISLRB October 26, 1994).  The Board's findings as to these facts are entitled to great weight and are prima facie true and correct.  
Laborers International Union, 
154 Ill. App. 3d at 1063.

The District contends that only minimal preference is given to former seasonal employees.  The Board disagreed with this contention.  The Board stated that the evidence showed the District rehires slightly more than 50% of the seasonal workers employed during a previous summer, and it solicits applications from an even greater percentage of the summer workforce.  The evidence elicited at the February 1997 hearing revealed that the District sent applications to 46 of 54 (85%) prior summer employees in December of 1995, months before new candidates could apply.  The Board also found that the District gives special consideration to previous employees because it mails applications to previous seasonal employees, regardless of whether the employee has requested an application, the interview requirement is waived, and rehires are paid more than new hires.  Therefore, viewing the facts in a light most favorable to the Board's conclusions, we find that it was reasonable for the Board to find that previous seasonal employees receive preference in the rehiring process.  

The District next argues that the licensing requirement is unique in this case because it is more easily satisfied than other licenses, like those for lifeguards.  The Board expressly rejected this argument when it found "the fact that the former employees have obtained the special license in the past supports a finding of a reasonable assurance of rehire."  The Board based this finding on testimony that employees must sit for an examination to obtain a pesticide operator's license, rehires who have passed the examination do not have to retake it even though the license must be renewed annually, and a rehiree can do this by obtaining the sponsorship of a field operator.  Thus, it is clear from the record that it is preferable for the District to rehire a prior employee who has already passed the pesticide operator's licensing examina-

tion.  We agree with the Board's finding on this factor.

The District's next contention is that seasonal employees are told they will have to reapply for future employment with the District and have to meet the same criteria as other applicants.  Although this is true, the Board relied on evidence that seasonal employees are told that if they do a good job they may be rehired and that the reapplication process for prior employees is far simpler than that for potential hires with no prior experience with the District.  In fact, most summers the majority of the seasonal employees are rehires.  For example, in 1995 and 1996, about 75% of the seasonal employees at the Hoffman Estates facility were rehires.  The District asserts that the Board's finding on this factor is against the manifest weight of the evidence because the seasonal employees actually do have to reapply for employment.  However, in 
City of Rushville, 
the Board found summer lifeguards who had to resubmit an application for seasonal employment were not short-term employees because of the preference they were given in the hiring process.  
City of Rushville, 
8 Pub. Employee Rep. (Ill.) par. 2042, No. S-RC-92-66 (ISLRB August 25, 1992)(finding summer lifeguards had a reasonable reassurance of rehire if their performance was satisfactory and they had certification, despite absence of express promises of rehire and existence of a reapplication requirement).     The District's reply brief argues that we should rely on 
City of Hoopeston, 
6 Pub. Employee Rep. (Ill.) par. 2040, No. S-RC-90-60 (ISLRB August 29, 1990).  There, the Board determined that summer part-time pool employees were short-term employees under the Act.  The Board reached this conclusion because the former employees had to reapply in the same manner as new applicants, the municipality made no commitments to rehire former employees and a smaller percentage of past employees were rehired than were not rehired.  In the instant case, it is clear that the reapplication process for former seasonal employees is different from that for new hires.  Former employees receive an application months before the normal hiring season begins and past employees do not have to interview for a position with the District.  The District compiles a list of its seasonal employees at the end of the summer, evaluates the work performance of each employee and then makes a specific recommendation as to whether an employee should receive a December application for rehire.  Finally, while it is true that during some summers less than half of the District's seasonal employees are rehires, the Board found that rehires usually made up more than half of the seasonal workforce.  Therefore, 
City of Hoopeston 
is distin-guishable and we find that the District's reapplication requirement does not prevent prior seasonal employee from having a reasonable reassurance of being rehired.  

The District also argues that the number of rehires varies from year to year and it is not District policy to tell seasonal employ-ees that they may be rehired if they do a good job.  Although the Board's decision did not address these factors directly, the evidence elicited at the hearing does show that there is a relatively constant number of seasonal employees and usually the majority are rehires.  In addition, in 
Village of Lake in the Hills, 
10 Pub. Employee Rep. (Ill.) par. 2030, No. S-RC-94-65 (ISLRB July 8, 1994)(finding significant number of rehires coupled with certifi-cate requirement showed a reasonable reassurance of rehire), the Board made clear that verbal assurances of rehire are not determina-tive of seasonal employees' status.  Thus, we will not disturb the Board's ruling on this basis.  

To be sure, the National Labor Relations Board (NLRB) not only looks at the above-referenced five factors when it determines whether seasonal employees have a reasonable expectation of reem-

ployment, but also looks to whether the employer has a stabilized demand for seasonal workers and whether the seasonal workers have common working conditions with their fulltime counterparts.  
Village of Lake in the Hills, 
10 Pub. Employee Rep. (Ill.) par. 2030, No. S-RC-94-65 (ISLRB July 8, 1994).  During the hearing before the ALJ, Szyska stated that the District hires about 54 or 55 seasonal employees each summer.  This evidence clearly shows a stabilized demand for seasonal workers that remains constant year after year.   On the issue of working conditions, the District does have a valid point that the seasonal employees have a unique job and that their work conditions differ from those of their full-

time counterparts.  However, case law and prior Board decisions do not indicate that this fact is enough to overturn a Board decision supported by substantial evidence.  

We agree with the Board's decision.  Substantial evidence supported the Board's conclusion that the District's seasonal employees had a reasonable assurance of being rehired for the same service in a subsequent calendar year.  Therefore, they cannot be excluded from the coverage of the Act as "short-term" employees.

B. Language of the Act  

   The District further argues that the Board's decision ignored the plain language of the Act.  Specifically, the District points to the statute's requirement that to be a "public employee" under the Act, an "individual" must be "employed by a public employer."  See 5 ILCS 315/3(n)(West 1996).  The District interprets this language to mean that, for jurisdictional purposes, an employee must be employed at the time the petition is filed or at the time of the hearing.  We disagree.  

As noted above, the Act provides that "public employee" means "any individual employed by a public employer *** but excluding *** short-term employees."  5 ILCS 315/3(n)(West 1996).  Section 3(q) then serves to define short-term employees and modifies section 3(n).  See 5 ILCS 315/3(q)(West 1996).  Therefore, under the Act, a person does not qualify as a "public employee" and must be considered a "short-term employee" if he or she meets the two-part test set forth in section 3(q).  However, those employees not expressly excluded from the coverage of section 3(n) are "public employees."  
Laborer's International Union, 
154 Ill. App. 3d at 1062.  

The District seeks to add a new exception to the statutory provision defining "public employee" by requiring employees to be on an employer's payroll when a union files a petition or when the Board conducts a hearing.  We want to make clear that such a requirement was not included by the legislature when it enacted the Act and our addition of this implied exclusion would render clearly defined exclusions, like those for short-term employees or supervisors, superfluous.  See 
People ex rel. Difanis v. Barr, 
83 Ill. 2d 191 (1980).  The Board and the Illinois courts have never included this type of requirement in their analysis of short-term employees for jurisdictional purposes.  In fact, many Board decisions run directly counter to the District's argument.  In 
Village of Manteno, 
seasonal employees who worked for the department of streets and alleys and a local golf course during the spring and summer months (April to August of 1993) were found to be public employees, even though the union's petition was filed on November 19, 1993, and a hearing was conducted on October 26, 1994.  
Village of Manteno, 
10 Pub. Employee Rep. (Ill.) par. 2046, No. S-

RC-94-69 (ISLRB October 26, 1994).  Similarly, in 
City of Rushville, 
the seasonal employees were not on the payroll when the union filed its petition or when the hearing was held but were still found to be public employees, as opposed to short-term employees.  
City of Rushville, 
8 Pub. Employee Rep. (Ill.) par. 2042, No. S-RC-92-66 (ISLRB August 25, 1992).

The District argues that the Board's decision in 
Elmhurst Park District, 
6 Pub. Employee Rep. (Ill.) par. 2010, No. S-RC-90-11 (ISLRB December 20, 1989), supports its argument.  This reliance is misplaced.  In 
Elmhurst Park District, 
the Board held that 23 seasonal employees who were not on the payroll were ineligible to vote in a union election.  Yet, the Board did count the same 23 seasonal employees for jurisdictional purposes.  In the case at bar, the 54 seasonal field operators have been counted for jurisdictional purposes only.  The Union even concedes that the seasonal employees will not be part of the bargaining unit.  Therefore, 
Elmhurst Park District 
and its decision concerning eligible union voters do not affect our decision to affirm the Board's decision.  

The District also argues that the Board's decision in 
Village of Bellwood, 
4 Pub. Employee Rep. (Ill.) par. 2042, No. S-RC-88-79 (ISLRB October 14, 1988), mandates using a broader test for deter-

mining who is a "public employee" under the Act.  We also find this argument to be without merit.  In 
Village of Bellwood, 
the Board found that part-time marshals who worked sporadically for a village were public employees under the Act.  In reaching this conclusion, the Board considered the "totality of the circumstances" surrounding the employment of the marshals.  Yet, 
Village of Bellwood 
did not address the issue of whether the part-time marshals were short-term employees.  Instead, the decision focused on whether an actual employer-employee relationship ever existed.  In the instant case, there is little question that the seasonal employees work on a daily, full-time basis for approximately three months of the year.

Thus, we hold that the approximately 50 to 60 seasonal employees hired by the District each summer are "public employees" under the Act.  Accordingly, we agree with the Board's findings and affirm its conclusion that the District's employees satisfied the jurisdictional minimum of 35 employees.        

III SUPERVISORS

The District also argues that the Board erred in finding the District's field supervisors are public employees under the Act because they meet the statutory definition of a "supervisor."  We disagree and affirm the Board's decision.  

Section 3(n) of the Act excludes those persons who meet the statutory definition of "supervisor."  5 ILCS 315/3(n)(West 1996).  The Act defines "supervisors" as employees "whose principal work is substantially different from that of his or her subordinates," and who devote "a preponderance of their employment time to exercising that authority."  5 ILCS 315/3(r)(West 1996).  Courts apply a four-

part test to determine whether an employee is a supervisor:

"(1) the supervisory employee must perform principal work substantially different from that of [his/]her subordinates; (2) the super-

visory employee must have authority to perform some or all of the 11 functions enumerated in section 3(r); (3) the supervisory employee must consistently use independent judgment in the performance of these 11 enumerated functions; and (4) generally, the supervisory employee must devote a preponderance of [his/]her time to exercising the authority to handle these 11 functions."  
Department of Central Management Services v. Illinois State Labor Relations Board, 
278 Ill. App. 3d 79, 83 (1996)(
CMS II), 
quoting 
Chief Judge, 
153 Ill. 2d at 515, 607 N.E.2d as 186.

An employee must satisfy all four parts of this test to be a supervisor under the Act.  
City of Freeport v. Illinois State Labor Relations Board, 
135 Ill. 2d at 533.

Currently, there is a split of authority as to how "preponderance of his/her time" should be construed.  In 
City of Freeport, 
the supreme court interpreted this term as requiring "the most significant allotment of the employee's time must be spent engaged in exercising supervisory functions."  
City of Freeport, 
135 Ill. 2d at 532.  In other words, the employee spends more time on supervisory functions than on any one nonsupervisory function.  
City of Freeport, 
135 Ill. 2d at 532.  In the case at bar, the field supervisors only spend three months of the year supervising the seasonal field operators.  Therefore, under the 
Freeport 
analysis they spend far more time engaging in nonsupervisory activities.

However, two decisions from the fourth district have reinterpreted the 
Freeport 
language.  In 
Department of Central Management Services v. Illinois State Labor Relations Board, 
249 Ill. App. 3d 740, 749 (1993)(
CMS I), 
the court held that an employee must spend the majority of his/her time in supervisory functions to be a supervisor under the Act.  But, in 
CMS II 
the court stated that the more important inquiry was whether the supervisory functions were superior in importance to the nonsupervisory functions.  
CMS II, 
278 Ill. App. 3d at 86.

The District urges this court to follow the 
CMS II 
standard and find that the field supervisors are supervisors under the Act because their most significant and important function is to supervise seasonal employees who do much of the actual mosquito abatement work.  The Board rejected this argument and concluded that the field supervisors satisfied all but the fourth prong of the statutory test.  According to the Board, the ALJ's findings supported a determination that the field supervisors perform work substantially different from that of their subordinates, they possess supervisory authority to direct seasonal workers with independent judgment, they have the power to reward subordinates with bonuses, and they have the authority to promote seasonal workers to the position of "back checker."  However, the Board agreed with the ALJ and decided the field supervisors' job of supervising seasonal employees for just three months of the year was insufficient to meet the preponderance requirement.  On that basis, the Board concluded that the field supervisors were not supervisors under the Act. 

We also agree with the Board's determination on this issue.  The question of whether the field supervisors should have been excluded from coverage of the Act involves a mixed question of law and fact.  In such a situation, the Board's resolution of a question is to be upheld if reasonable, consistent with labor law and based on findings supported by substantial evidence.  
Rockford Township Highway Department, 
153 Ill. App. 3d at 875.  In the instant case, the Board analyzed the issue using a test articulated by the Illinois Supreme Court in 
City of Freeport, 
avoided conflicts between employees because the seasonal employees are not part of the bargaining unit, and based its decision on substantial evidence regarding the job duties of the District's field supervisors.  Furthermore, it is unclear from the record how the field supervisors' supervisory duties of relatively short duration are more significant than their activities for nine months of the year.  Therefore, we find that the Board did not err in finding that the field supervisors were not statutory supervisors and that the field supervisors were properly included in the bargaining unit. 

IV SUPPLEMENTAL EVIDENCE

The District finally argues that as of the date the petition was filed, January 28, 1997, the District had only eight employees and, therefore, the Board should have never exercised jurisdiction.

On June 7, 1997, the ALJ issued a recommended decision and ordered an election.  Then, on June 23, 1997, before filing its exceptions to the ALJ's decision, the District moved to supplement the record with an affidavit from Szyska.  The affidavit stated that the District did not provide the seasonal employees with a reasonable assurance of rehire.  The Board refused to consider the affidavit because the petition filing date is the significant date for determining whether the Act applies, and the Board typically refuses to consider information concerning employment that arises after the filing date.  See 
City of Shelbyville, 
2 Pub. Employee Rep. (Ill.) par. 2051, No. S-RC-172 (ISLRB October 30, 1986); 
City of Sparta, 
9 Pub. Employee Rep. (Ill.) par. 2029, No. S-RC-92-100 (ISLRB June 21, 1993).

The District raises the Board's decision in 
City of Mount Vernon 
as evidence of the confusion on this issue.  
City of Mount Vernon, 
9 Pub. Employee Rep. (Ill.) par. 2022, No. S-RC-91-128 (ISLRB April 3, 1993).  The District further states that information arising after the filing date of a petition is relevant because of the broader employment analysis espoused in 
Bellwood.

First, as discussed above, the 
Bellwood 
analysis does not apply here.  This case has nothing to do with part-time employees and whether they have an employer-employee relationship.  Instead, we are addressing the issue of full-time seasonal employees and whether they can be excluded from coverage of the Act as short-term employees.

Second, 
City of Mount Vernon 
found that post-filing evidence would only be considered when "radical changes" of governmental structure occur after a petition has been filed.  In 
City of Mount Vernon, 
17 library workers were excluded from the jurisdiction of the Act because the identity of their employer changed from a city library to a library district.  No change of this type occurred in the instant case.  Therefore, we find that 
City of Mount Vernon 
does not apply here and that 
City of Shelbyville 
clearly states that the date a petition is filed is the significant date for determining jurisdiction.  See 80 Ill. Adm. Code §1210.100(e) (1996) (filing of a petition triggers a Board investigation).   

V Conclusion

For the aforementioned reasons, we affirm the decision of the Illinois State Labor Relations Board.

Affirmed.

CAMPBELL, P.J., and QUINN, J., concur.

FOOTNOTES
1:  At the February 27, 1997, hearing, the parties stipulated that Levinson, Szyska, Dave Baker, Mark Baker, Oemick and the office manager, Jan Soderstrom, were not part of the proposed bargaining unit.